**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KENNETH C. WYZGOSKI, Individually and On Behalf of All Others Similarly Situated, | ) ) ) Case No. ) |
| | ) |
| Plaintiff, | ) **CLASS ACTION COMPLAINT** |
| | ) |
| v. | ) **JURY TRIAL DEMANDED** |
| | ) |
| TG THERAPEUTICS, INC., MICHAEL S. WEISS, SEAN A. POWER, and ROBERT NIECESTRO, | ) ) ) ) |
| | ) |
| Defendants. | ) ) |

**CLASS ACTION COMPLAINT**

Plaintiff Kenneth C. Wyzgoski ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding TG Therapeutics, Inc. ("TG Therapeutics" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired TG Therapeutics securities between September 15, 2014 and October 12, 2016, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      TG Therapeutics is a biopharmaceutical company focused on the acquisition, development and commercialization of novel treatments for B-cell malignancies and autoimmune diseases. Currently, the Company is developing two therapies targeting hematological malignancies and autoimmune diseases: (i) TG-1101 (ublituximab), a novel, glycoengineered monoclonal antibody that targets a specific and unique epitope on the CD20 antigen found on mature B-lymphocytes; and (ii) TGR-1202, an orally available PI3K delta inhibitor for various hematologic malignancies.

3.      TG Therapeutics was founded in 1993 and is headquartered in New York, New York.  TG Therapeutics' stocks trade on the Nasdaq Capital Market ("NASDAQ") under the ticker symbol "TGTX."

4.      On September 17, 2015, the Company announced that it had reached an agreement with the U.S. Food and Drug Administration ("FDA") regarding a Special Protocol Assessment ("SPA") on the design of a Phase 3 clinical trial for its proprietary combination of TG-1101 (ublituximab), its glycoengineered anti-CD20 monoclonal antibody, plus TGR-1202, the Company's once-daily PI3K-delta inhibitor, for the treatment of Chronic Lymphocytic

2

Leukemia ("CLL"). The Phase 3 clinical trial, referred to by the Company as "GENUINE," consisted of two parts:

- Part I to evaluate the effect of the addition of TG-1101 to ibrutinib on overall response rate (ORR) in approximately the first 200 patients enrolled, to support a filing for accelerated approval of TG-1101; and
- Part II to evaluate the effect of the addition of TG-1101 to ibrutinib on progression-free survival (PFS) in all study patients (approximately 330), to support a filing for full approval of TG-1101.

5.       The purpose of the Phase III GENUINE trial was to show that TG-1101, in combination with Imbruvica (the trade name for an ibrutinib-based small molecule drug used to treat B cell cancers), could show an improvement in overall response rate ("ORR") and progression-free survival ("PFS") in 330 previously-treated patient with certain cancer cell mutations.

6.       Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations and business.  Specifically,  Defendants made false and/or misleading statements and/or omitted material information concerning the GENUINE Phase III trial, assuring investors it was a "best-in-class treatment" that would be "successful" and "offer patients a novel chemo-free treatment option."  As a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.

7.       On October 13, 2016, TG Therapeutics announced that the Company had filed an "amended protocol for its GENUINE Phase 3 trial," which entirely abandoned Part II of the Phase III GENUINE study designed to measure the combination's effect on progression-free survival, thereby annulling the SPA with the FDA. Accordingly, the study's sole primary endpoint was reduced to only overall response rate (ORR), as contemplated in Part I of the study, and the target enrollment was reduced to only 120 patients. As a result of cutting enrollment by

more than half, the Company stated it could be another two years to reach 330 patients – the number needed to have sufficient powering to show a PFS benefit.

8.      According to analysts, excluding patients who have already taken Imbruvica "is an obvious barrier to enrollment" and significantly increases the likelihood that the FDA will not approve the combination treatment.

9.      On this news, TG Therapeutics' share price fell $2.24, or 27%, to close at $6.01 on October 17, 2016.

10.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

13.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant TG Therapeutics is headquartered within this District.

14.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

15.     Plaintiff, as set forth in the attached Certification, acquired TG Therapeutics securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

16.     Defendant TG Therapeutics is incorporated in Delaware and the Company's principal executive offices are located at 2 Gansevoort Street, 9th Floor, New York, New York 10014. TG Therapeutics' common stock trades on the NASDAQ under the ticker symbol "TGTX."

17.     Defendant Michael S. Weiss ("Weiss") has served at all relevant times as the Company's Chief Executive Officer ("CEO"), Interim President and Executive Chairman.

18.     Defendant Sean A. Power ("Power") has served at all relevant times as the Company's Chief Financial Officer.

19.     Defendant Robert Niecestro ("Niecestro") has served at all relevant times as the Company's Executive Vice President of Clinical and Regulatory.

20.     The Defendants referenced above in ¶¶ 17-19 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

21.     TG Therapeutics is a biopharmaceutical company focused on the acquisition, development and commercialization of novel treatments for B-cell malignancies and autoimmune diseases. Currently, the Company is developing two therapies targeting hematological malignancies and autoimmune diseases: (i) TG-1101 (ublituximab), a novel, glycoengineered monoclonal antibody that targets a specific and unique epitope on the CD20

5

antigen found on mature B-lymphocytes; and (ii) TGR-1202, an orally available PI3K delta inhibitor for various hematologic malignancies.

### Material False and Misleading
### Statements Issued During the Class Period

22.     The Class Period begins on September 15, 2014, when TG Therapeutics issued a press release about the SPA successfully negotiated with the FDA ("September 2014 Press Release"). The Company also attached the press release to a Form 8-K filed with the SEC. In the September 14 Press Release, Defendants touted the SPA and assured investors that the trial data would serve as the basis to submit a Biologics License Application ("BLA") "for accelerated approval" to the FDA and for full approval of the combination treatment:

> TG Therapeutics, Inc. (Nasdaq: TGTX) announced today that it has reached an agreement with the U.S. Food and Drug Administration (FDA) regarding a Special Protocol Assessment (SPA) on the design, endpoints and statistical analysis approach of a Phase 3 clinical trial for TG-1101 (ublituximab), its glycoengineered anti-CD20 monoclonal antibody, in combination with Imbruvica® (ibrutinib) for the treatment of Chronic Lymphocytic Leukemia (CLL) in patients with high risk cytogenetics. **The SPA provides agreement that the Phase 3 trial design adequately addresses objectives that would support the regulatory submission for drug approval.**
>
> Full details of the Phase 3 clinical trial will be released at the launch of the study, which is expected to occur before the end of the year. In this randomized controlled trial, patients will receive either TG-1101 plus ibrutinib or ibrutinib alone. The trial will enroll approximately 330 patients, with approximately the first two-thirds of the patients included in the ORR assessment. **As per the SPA, the Company plans to use the ORR data from the trial as the basis for submission of a Biologics License Application (BLA) for accelerated approval for TG-1101. All patients will then be followed for PFS assessment, which is designed to support full approval.**
>
> [···]
>
> The Special Protocol Assessment (SPA) process is a procedure by which the FDA provides official evaluation and written guidance on the design and size of proposed protocols that are intended to form the basis for a

new drug application. Final marketing approval depends on the results of efficacy, the adverse event profile and an evaluation of the benefit/risk of treatment demonstrated in the Phase 3 clinical program. The SPA agreement may only be changed through a written agreement between the sponsor and the FDA, or if the FDA becomes aware of a substantial scientific issue essential to product efficacy or safety.

(Emphasis Added).

23.    On December 9, 2014, the Company issued a press release ("December 2014 Press Release"), falsely assuring investors that the Phase III GENUINE trial would be a success, stating, in relevant part:

**We continue to be impressed with the clinical activity and safety profile of ublituximab in combination with ibrutinib, especially in the high-risk CLL patient group which we will be evaluating in the upcoming Phase 3 trial.** This data not only shows ublituximab can be safely combined with ibrutinib, but also can induce rapid and deeper responses compared to prior trials of ibrutinib alone. **I am very excited, along with the team of investigators at US Oncology, to lead the upcoming Phase 3 trial and believe it will be an attractive protocol with great interest from patients for this study.**"

(Emphasis Added).

24.    Moreover, Defendant Weiss further touted the Phase III trial:

**We are thrilled by the data presented today** by Dr. Sharman and colleagues which further supports our previously announced Phase 3 strategy for TG-1101. **The high-risk CLL patient group, which achieved a 95% ORR, is the same patient population we will be studying in our randomized Phase 3 trial which utilizes ORR as a primary endpoint to support accelerated approval.** […] **These results, coupled with a favorable safety profile, which does not appear to differ significantly from that of single agent ibrutinib, continues to support our belief that TG-1101 plus ibrutinib is an attractive treatment option for patients with relapsed refractory CLL and MCL.** We thank Dr. Sharman and all the investigators from this Phase 2 trial, and **look forward to the imminent launch of our Phase 3 trial of TG-1101 with ibrutinib.**

(Emphasis Added).

7

25.    On March 12, 2015, during a conference call with investors regarding the

Company's fourth quarter 2014 financial results, Defendant Weiss stated in pertinent part:

> As per the SPA, if positive the company plans to file the overall response
> data from the trial to support accelerated approval for TG-1101. **All
> patients will then be followed for progression free survival or PFS,
> which is designed to support full approval of TG-1101**. We are very
> excited about the prospects of this study and **look forward to completing
> enrollment and reporting on the overall response endpoint in the
> second half of 2016.**

(Emphasis Added).

26.    On June 18, 2015, the Company issued a press release ("June 2015 Press

Release"), in which Defendants ensured investors that the GENUINE Phase III trial was

performing well and described it as a "best-in-class treatment":

> **We continue to be pleased with the performance of the combination of
> TG-1101 plus ibrutinib and continue to believe the combination
> represents a best-in-class treatment for patients with
> relapsed/refractory CLL, especially in patients with high-risk disease**,
> which is generally known to be chemotherapy resistant. We expect, if
> approved, TG-1101 will be the first chemo-free combination approved
> with ibrutinib for patients with relapsed/refractory CLL. **The data
> presented today gives us additional confidence that the outcome of our
> Phase 3 GENUINE Study will be successful and we will be able to
> offer patients a novel chemo-free treatment option.** We greatly
> appreciate the dedication to the program from our Study Chair Dr. Jeff
> Sharman and all the participating sites and physicians across the country
> that are participating in this important clinical trial.

(Emphasis Added).

27.    On August 10, 2015 during a conference call with investors and analysts

regarding the second quarter 2015 financial results, Defendant Weiss falsely claimed that patient

enrollment in the GENUINE Phase III trial was on track and that the study "is supported by . . .

compelling data":

> [L]et me do a quick update on our ongoing GENUINE Phase 3 trial.
> During the quarter we were excited to announce that we now have over

120 sites open to enrollment into this Phase 3 clinical trial. **Driving enrollment into our GENUINE trial is our top priority and to already have so many sites on board is an incredible accomplishment.** From the design standpoint the GENUINE Phase 3 study is a randomized trial where patients will receive either 1101 in combination with ibrutinib or ibrutinib alone. The population for this study is patients with high risk chronic lymphocytic leukemia or CLL, while **the primary endpoint of the study is progression free survival**.

Approximately the first few 100 patients of an expected total enrollment of approximately 330 patients will be assessed for overall response rate or ORR. If the ORR assessment is positive, as per our session protocol assessment or SPA, the company plans to use the overall response data as a basis for submission for accelerated approval for 1101. **All patients will then be followed for PFS assessment, which is designed to support full approval.** As mentioned in the past we hope to complete enrollment into the study and evaluate the overall response endpoint by the end of 2016. **The study is supported by what we believe is very compelling data demonstrating the safety and activity of this regimen**.

(Emphasis Added).

28.     On March 7, 2016, the Company issued a press release ("March 2016 Press Release"), commenting on the Company's Fiscal Year 2015 results and the outcome of the GENUINE Phase III trial:

2015 was a transformational year for our Company as we launched our first registration study, the GENUINE Phase 3 study, and also obtained an SPA for our proprietary combination of TG-1101 and TGR-1202, the '1303' regimen, enabling our UNITY-CLL trial for patients with frontline and previously treated CLL. **During 2016 we will be focused on executing our ongoing Phase 3 clinical programs** as well as expanding our '1303' regimen into registration-directed trials for both diffuse large b-cell lymphoma and indolent lymphomas."

[…]

2015 Highlights:
- Commenced enrollment into the GENUINE Phase 3 clinical trial, which is **now open in over 150 sites throughout the US.**

Key Objectives for 2016:
**- Aggressively recruit into the GENUINE Phase 3 clinical trial**.

(Emphasis Added).

29.     On March 9, 2016, during an investor conference call on the fourth quarter and full-year 2015 financial results, Defendant Weiss reassured investors that the Phase III GENUINE trial was on track:

> **With 2015 spend building our trial site network, 2016 is a year of enrollment for us.** We've been pleased by the early adapters into the GENUINE study, including several major academic centers as well as the few large community networks.
>
> **In the broader community, we found that testing for high risk CLL was not routinely done and since few front line patients have high risk features, many patients at the time of relapsed were not being receptive. We are in the process of launching a separate screening protocol that will enable sites to more easily screen all relapsing patients.**
>
> As expected, we're finding that about half of the patients that are screened, few have high risk features, which is consistent with our projections. Again, we believe the screening protocol that we're launching now will certainly streamline the process and accelerate enrollment.
>
> **With so many great sites on board, we believe we're nearing that key inflection point where these types of studies accelerate dramatically.** When that occurs, we will be able to provide more clear guidance as to when the study will be completed, but until then we're continuing to target the end of year to complete enrollment with data in early '17.

(Emphasis added).

30.     On May 10, 2016, TG Therapeutics issued a press release ("May 2016 Press Release") reaffirming the 2016 milestones for the GENUINE Phase II trial, including the continuation to "aggressively" recruit into the trial.

31.     During an August 8, 2016 conference call with investors, Defendant Weiss continued to reassure investors that, despite slower than expected enrollment in the GENUINE Phase III trial, Defendants were fixing the issue and that they "**still believe that GENUINE's goal of improving on ibrutinib therapy represents an important treatment goal. There is no question that ibrutinib is a very good drug, but few if any patients are cured with single agent ibrutinib.**" (Emphasis added).

32.    The statements in paragraph 22-31, above were materially false and misleading when made because, contrary to Defendants' representations, TG Therapeutics had failed to implement a proper screening protocol in the GENUINE enrolling sites, was not enrolling patients at the required rate for the study to be completed on time, the trial would never get 330 enrolled patients, and PFS was not an achievable endpoint. As a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.

**The Truth Emerges**

33.    On October 13, 2016, the Company issued a press release ("October 2016 Press Release"), announcing that it had filed with the FDA an amended protocol for the GENUINE Phase 3 trial GENUINE Phase III trial. The Company also attached the press release to a Form 8-K filed with the SEC. The press release stated in pertinent part:

> TG Therapeutics, Inc. (NASDAQ: TGTX) today announced that it has filed with the FDA an amended protocol for the GENUINE Phase 3 trial. Prior to the amendments, the GENUINE study consisted of two parts:
> - Part I to evaluate the effect of the addition of TG-1101 to ibrutinib on overall response rate (ORR) in approximately the first 200 patients enrolled, to support a filing for accelerated approval of TG-1101; and
> - Part II to evaluate the effect of the addition of TG-1101 to ibrutinib on progression-free survival (PFS) in all study patients (approximately 330), to support a filing for full approval of TG-1101.
>
> **The amended protocol contains the following substantive changes:**
> - **Part II of the study has been eliminated, and accordingly, the study's sole primary endpoint will be ORR as originally contemplated in Part I; and**
> - **Target enrollment has been reduced to approximately 120 randomized patients.**
>
> At the new study size, the study is 90% powered to show a statistically significant improvement in ORR, with the minimal detectable difference of approximately 20% (absolute difference between the arms). Additionally, patients will be followed until progression, but the study will no longer be powered for PFS.
>
> The Company expects that it will complete enrollment in the revised trial by year end 2016, and will have topline data available in the first half of 2017. If the

results of the study are positive, the Company plans to request a pre-BLA meeting to discuss the data and a filing strategy with the FDA. The Company has communicated with the FDA regarding its intention to file a BLA for accelerated approval if the results are positive and the FDA has agreed that a pre-BLA meeting can be requested based on ORR data from the GENUINE study. Assuming a positive outcome of a pre-BLA meeting, targeted to occur in the fourth quarter of 2017, the Company believes it could file a BLA in the first half of 2018.

Michael S. Weiss, the Company's Executive Chairman and Interim Chief Executive Officer, stated, "**Today's announcement marks an important milestone for the Company. Given the GENUINE enrollment challenges we have faced to date, we are very excited to accelerate the trial to a rapid conclusion**, while also maintaining the ability to potentially file the data for accelerated approval. **The GENUINE study, as amended, remains a robust, randomized clinical trial, which we believe, if positive, could support accelerated approval for patients with relapsed/refractory high-risk CLL**. Moreover, we believe the amended study and revised regulatory strategy is consistent with the recent accelerated approvals for novel agents in CLL, which notably were not pursuant to an SPA but occurred after the finding of positive ORR results. **Importantly, with completion of enrollment now expected by year end, we and our clinical trial sites can focus our resources on completing our UNITY-CLL Phase 3 trial as quickly as possible.** Early enrollment in UNITY-CLL is very encouraging and we anticipate that study will be fully enrolled before filing a BLA for the GENUINE study. UNITY-CLL remains unchanged and unaffected by the amendments to the GENUINE study, and if positive, could support full approval for both TG-1101 and TGR-1202 based on its primary endpoint of PFS." Mr. Weiss continued, "We have greatly appreciated all of the guidance and counsel from the FDA in designing our clinical programs and we look forward to continuing our collaborative working relationship as we accelerate toward the conclusion of enrollment into the GENUINE study this year and ORR data in the first half of 2017."

(Emphasis Added).

34.    Also on October 13, 2016, *TheStreet* published an article addressing the Company's October 2016 Press Release ("*TheStreet* October 13, 2016"). The article stated in pertinent part:

> **TG Therapeutics (TGTX) has long suffered from a management credibility problem. Thursday, CEO Mike Weiss tried to spin as positive a major revision to a pivotal phase III study of its anti-CD20 monoclonal antibody ublituximab in patients with relapsed/refractory, high risk chronic lymphocytic leukemia**.

"Today's announcement marks an important milestone for the Company," said Weiss in the TG Therapeutics press release. "Given the GENUINE [phase III] enrollment challenges we've faced to date, we are very excited to accelerate the trial to a rapid conclusion, while also maintaining the ability to potentially file the data for accelerated approval."

**Sure, if you define milestone as blowing up a Special Protocol Assessment reached with the FDA, cutting planned enrollment by one third, eliminating important efficacy endpoints and generally loading up the study and the company's regulatory strategy with way more risk. Excellent!**

TG Therapeutics is down 15% to $7.05.

(Emphasis Added).

35.     The same day, on a conference call to discuss the amendments to the GENUINE Phase III trial, CEO Weiss revealed that 330 patients was a number that was highly overpowered, and that 120 patients would be sufficient to achieve FDA approval, consistent with prior discussions between the Company and the FDA.

36.     On this news, TG Therapeutics' share price fell $2.24, or 27%, to close at $6.01 on October 17, 2016.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

37.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired TG Therapeutics securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

38.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, TG Therapeutics securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by TG Therapeutics or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

39.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

40.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

41.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of TG Therapeutics;

- whether the Individual Defendants caused TG Therapeutics to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of TG Therapeutics securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

42.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

43.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- TG Therapeutics securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold TG Therapeutics securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

44.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

45.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Against All Defendants For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder)

46.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

47.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

48.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of TG Therapeutics securities; and (iii) cause Plaintiff and other members of the Class to purchase

or otherwise acquire TG Therapeutics securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

49.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for TG Therapeutics securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about TG Therapeutics' finances and business prospects.

50.    By virtue of their positions at TG Therapeutics, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

51.    Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of TG Therapeutics securities from their personal portfolios.

52.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of TG Therapeutics, the Individual Defendants had knowledge of the details of TG Therapeutics' internal affairs.

53.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of TG Therapeutics.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to TG Therapeutics' businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of TG Therapeutics securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning TG Therapeutics' business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired TG Therapeutics securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

54.     During the Class Period, TG Therapeutics securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of TG Therapeutics securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have

purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of TG Therapeutics securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of TG Therapeutics securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

55.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

56.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the
### Exchange Act Against The Individual Defendants)

57.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

58.    During the Class Period, the Individual Defendants participated in the operation and management of TG Therapeutics, and conducted and participated, directly and indirectly, in the conduct of TG Therapeutics' business affairs. Because of their senior positions, they knew the adverse non-public information about TG Therapeutics' misstatement of income and expenses and false financial statements.

59.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to TG Therapeutics' financial condition and results of operations, and to correct promptly any public statements issued by TG Therapeutics which had become materially false or misleading.

60.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which TG Therapeutics disseminated in the marketplace during the Class Period concerning TG Therapeutics' results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause TG Therapeutics to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of TG Therapeutics within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of TG Therapeutics securities.

61.     Each of the Individual Defendants, therefore, acted as a controlling person of TG Therapeutics.  By reason of their senior management positions and/or being directors of TG Therapeutics, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, TG Therapeutics to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of TG Therapeutics and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

62.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by TG Therapeutics.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: January 24, 2017

                                          Respectfully submitted,

                                          **POMERANTZ LLP**

                                          */s/ Jeremy A. Lieberman*
                                          Jeremy A. Lieberman
                                          J. Alexander Hood II
                                          600 Third Avenue, 20th Floor
                                          New York, New York 10016
                                          Telephone:  (212) 661-1100
                                          Facsimile:  (212) 661-8665
                                          Email:  jalieberman@pomlaw.com
                                                      ahood@pomlaw.com

                                          **POMERANTZ LLP**
                                          Patrick V. Dahlstrom
                                          10 South La Salle Street, Suite 3505
                                          Chicago, Illinois 60603
                                          Telephone:  (312) 377-1181
                                          Facsimile:  (312) 377-1184
                                          Email:  pdahlstrom@pomlaw.com

21

**BRONSTEIN, GEWIRTZ
& GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile (212) 697-7296
Email:  peretz@bgandg.com

*Attorneys for Plaintiff*